UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,    :

                Plaintiff,    :             1:20 CR 228(S-2) (LDH)

      - against -       :

                            :

TYLOR SALMERON,        :

              Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - -X

## SENTENCING MEMORANDUM ON BEHALF OF TY SALMERON

Yusuf El Ashmawy, Esq.
The Law Offices of Yusuf El Ashmawy. Esq., P.C.
305 Broadway, 7th Floor
New York, NY 10007
(718) 207-5787
*Counsel for Tylor Salmeron*

Margaret M Shalley, Esq.
Margaret M Shalley, Esq. and Associates, LLC
225 Broadway Suite 715,
New York, NY 10007
*Counsel for Tylor Salmeron*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,   :

              Plaintiff,   :             1:20 CR 228(S-2) (LDH)

    - against -   :

                         :

TYLOR SALMERON,   :

           Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - -X

## PRELIMINARY STATEMENT

## I.    INTRODUCTION

Tylor Salmeron's short life has consisted almost exclusively of abandonment, abuse, displacement and trauma. He was abandoned by his own mother as an infant. He was forced to leave the United States due to lack of resources and then wrenched from his father and homeland back to the United States due to violence and instability in El Salvador. Once returned to the United States, he was hurled into a confusing, chaotic and unfamiliar environment. As a result of these tragic circumstances, Mr. Salmeron has struggled with depression, anxiety, post-traumatic stress and pervasive substance abuse problems. He has a long history of self-harming behaviors—including self-mutilation—that began when he was involuntarily removed from his extended family in Long Island and placed in foster care. He has abused and self-medicated with substances to numb his pain and hopelessness. Writted into federal custody at just 19, Mr. Salmeron has been detained at the infamous Metropolitan Detention Center ("MDC") in Brooklyn for the last two years. In this span, defense counsel has struggled to bring any form of hope or comfort to him—and it has been difficult to observe someone so young experience so much pain.

The Defense respectfully submits this memorandum on behalf of Mr. Salmeron in support of a below guidelines sentence not to exceed 108 months. A variance and below guidelines sentence find support both in the Presentence Investigation Report (hereinafter "PSR") and the attached mitigation report prepared by Jenny Crawford, LMSW—a clinical professor of social work at Columbia University (hereinafter "Mitigation Report"). *See,* Mitigation Report prepared by Jenny G. Crawford, LMSW.

Probation's findings regarding factors that may warrant a variance are compelling, specifically stating:

"The defendant's lack of stability as a child, including placement in youth facilities, and abuse throughout his childhood, may be considered as a mitigating factor, potentially

> warranting a variance. Additionally, the defendant's youthful age at the time he committed the prior offenses and the conduct underlying the instant offense may also be considered as a mitigating factor, warranting a variance."

PSR at p. 22, ¶133.

As is sadly commonplace in this practice, Mr. Salmeron's tragic background, lack of family stability and extensive trauma history served as a platform for becoming involved with MS-13 and engaging in the underlying offense conduct. However, Mr. Salmeron is very young, has no criminal history points, and this is his first criminal conviction. PSR at p. 15-16, ¶¶ 89-96. Further, Mr. Salmeron quickly accepted responsibility for his actions and immediately pleaded guilty so that he may be held accountable for his conduct and move forward in life.  He was arraigned on this superseding indictment June 29, 2023, the Defense swiftly communicated to the Government that Mr. Salmeron wished to plead guilty and after consistent negotiation of terms—and logistical challenges—Mr. Salmeron had a Change of Plea Hearing before Magistrate Bulsara on January 19, 2024.  ECF 315; ECF 475 Et. Seq.  It is worth noting that Mr. Salmeron <u>was the first person on this superseding indictment to plead guilty</u>. *Id.* Since doing so, six others have followed him. *See*, ECF 499, 504, 519, 560 (regarding two co-defendants), & 584.

The Government has focused upon the offense conduct and institutional infractions as a basis for this Court to sentence Mr. Salmeron towards the "high end of the United States Sentencing Guidelines". ECF 605, P. 1. While the points raised by the Government are valid, they ignore the context provided in this submission.  Further, the Defense agrees with Probation's findings regarding the factors in this case that warrant a variance and maintains that a below guidelines sentence is "sufficient, but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. § 3553(a).


## II. <u>PROCEDURAL HISTORY</u>

Both the PSR and the Government's submission outline the procedural history.  PSR at p. 1; ECF 605 at 5.  The Defense agrees with the procedural history in both submissions.

## III. THE GUIDELINES

The Defense does not dispute Probation's guidelines calculations as set forth in the PSR. Probation calculates a Combined Adjusted Offense Level of 39, with an Adjusted Total Offense level of 36, crediting Mr. Salmeron's acceptance of responsibility and timely notification of the intention to plead guilty.  PSR at p. 15, ¶¶ 84-88. Mr. Salmeron has a criminal history score of zero and is thus in Criminal History Category I.  *Id.* at p.16, ¶ 92.  At Level 36 in Category I, the guideline imprisonment range is 188-235 months. *Id.* at p. 20, ¶120.

## IV. <u>A NON-GUILDLINES SENTENCE IS APPROPRIATE UNDER 18 U.S.C. § 3553(a)</u>

## A.  The Purposes of Sentencing in This Case are Satisfied by a Non-Guidelines Sentence.

18 U.S.C. § 3553(a) requires a court to impose a sentence that is reasonable and "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection." 18 U.S.C. § 3553 (a)(2) states that such purposes are: to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553 (a)(2) (A)-(D).

A sentence of 108 months or below in this matter promotes respect for the law, provides "just punishment" and reflects the seriousness of the offense conduct. A longer sentence is not needed to deter Mr. Salmeron from further unlawful conduct based on his acceptance of responsibility and efforts at rehabilitation for the last two years—documented in the five attached service certificates filed with this submission. *See*, Salmeron Certificates pp. 1-5.

Regarding the concept of deterrence, there is ample evidence that increased sentence length has no measurable impact on reducing crime. "Three National Academy of Science panels, ... reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).[1] *See also* Andrew von Hirsch, et. al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).[2] The von Hirsch analysis, commissioned by the British Home Office, examined penalties in the United States and in several European countries. It concluded that the "correlations between sentencing severity and crime rates were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects." *Id.* The reason for this is that potential defendants are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentencing consequences in the manner one might expect. Tonry, *supra,* at 28-29. "There is generally no significant association between perceptions of punishment levels and actual levels ... implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." Gary Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005). Any increased punishment in this case would not provide greater "general deterrence" to the public at large.

## B. Analysis of the 3553(a) factors strongly supports a non-Guidelines sentence in this case.

18 U.S.C. § 3553(a) additionally directs a sentencing court to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the guidelines sentencing range and policy statements, the need to avoid unwarranted sentencing disparities among defendants involved in similar conduct with similar criminal history, and the need to provide restitution to any victim(s) of the offense.

---

[1] This article is available on Westlaw.
[2] A summary of the von Hirsch report is available at http://members.lycos.co.uk/ lawnet/SENTENCE.PDF.

Under 18 U.S.C. § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." The directives of *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), *United States v. Crosby*, 397, F. 3d. 103 (2d Cir. 2005), and § 3553(a) hold that courts must consider all the factors in § 3553(a).

As the Second Circuit observed in *United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008):

> it is the district court's particular trust to ensure the "uniform and constant" principle of the federal sentencing tradition, specifically, that "every convicted person [be considered] as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue," [citing] *Koon v. United States*, 518 U.S. at 113.

*Jones*, at 182. To secure the objectives of § 3553 (a), a district judge must fully exercise his or her proper sentencing authority. *See Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456, 2463 (2007).

Finally, it has been observed that sentencing is not an exact science. Rather it is a "fluid and dynamic process." *Irizarry v. United States*, 553 U.S. 708, 715, 128 S. Ct. 2198, 2203 (2008) (citing *United States v. Vega-Santiago*, 519 F.3d 1, 4 (1st Cir. 2008) (*en banc*)). Its aim should be to impose a sentence that is reasonable, fair, and just given the facts of a particular case and the facts relative to the person being sentenced. The overarching goal is to fashion a sentence that is sufficient, but not greater than necessary. On this point, it has been noted that:

> "[w]hile there are many compelling considerations in every sentencing decision, a sentencing judge must have some understanding of the diverse frailties of human kind[,] . . . what it is like to be in trouble and in pain."

*United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

An analysis of relevant § 3553(a) factors in this case supports the imposition of a below guidelines sentence for Mr. Salmeron:

**The Nature and Circumstances of the Offense.**

It is undisputed by Mr. Salmeron that the offense conduct he engaged in is extremely serious. Mr. Salmeron admitted to the offense conduct in open court during his plea allocution and stated on record that he was aware that this conduct was wrongful and illegal and seeks the Court's mercy. This is his first criminal conviction.

**The History and Characteristics of Mr. Salmeron.**

4

The Defense begins this section with a brief anecdote regarding a conversation with Mr. Salmeron early on in our representation. In a meeting at the MDC, I was explaining to Mr. Salmeron that for the Defense to best represent him we'd need to delve into his life and background—including painful and private things. After establishing this concept, I asked Mr. Salmeron to describe to me what his life was like growing up and he responded with a phrase in Spanish that I did not understand. When asked to translate what he'd said into English, he said in a deadpan manner characteristic of his presentation, "[v]ivi como un burro." In English this translates to: "I lived like a donkey."

As recounted below, this was only half the story. By all evidence and Mr. Salmeron's account, he did, in fact, live like a farm animal as a child in El Salvador—working in the fields doing manual labor, being beaten by his father on a regular basis and not having any of the basic formative experiences one hopes to have as a child. His story then shifts dramatically—with an abrupt decision to return him and his siblings to America unaccompanied, to reside with extended family in Long Island due to unrest and violence in El Salvador. The day he left El Salvador was the last time he ever saw his father. Ms. Crawford's mitigation report—corroborated by the "Offender Characteristics" section of the PSR—provides a detailed depiction of Mr. Salmeron's difficult life and the references below are drawn from these sources as well observations of counsel. *See generally*, PSR at pp. 17-20, ¶¶ 97-118; Mitigation Report pp. 1-11.

Mr. Salmeron was born November 30, 2002, but is unaware of any details of where he was born or what he was like as a baby. Mitigation Report at p. 2. He is the third child born to parents Manuel Salmeron and Melinda Colon and has two full older siblings – Lucinda and Mario. *Id* at 2. Mr. Salmeron entered a "fractured family living on the margins with no permanent home." *Id.* He has no memories of his mother – who abandoned the family soon after Mr. Salmeron's birth. *Id.* He was told she had serious mental health issues and presented in meetings with Ms. Crawford as "dissociated from the relationship a mother has with a child". *Id.* Mr. Salmeron reports that his mother has several other children and believes that he has "maybe 8 half-siblings" whom he has never met. *Id.* Mr. Salmeron has stated to defense counsel that he has no recollection of his mother ever holding him, feeding him or providing him with any kind of love or care—and while doing so, the pain in his expression was palpable.

Facing the seemingly impossible task of raising three young children alone, Manuel Salmeron relocated the family back to El Salvador when Mr. Salmeron was three years old. Mitigation Report at p. 2. According to Cruz Hernandez, Manuel Salmeron's aunt who lives in Westbury, Manuel relentlessly tried to make it work New York on behalf of his children, knowing returning to El Salvador was a "dangerous option." *Id.* at 2. His lack of legal status created significant barriers for the family to live safely in the United States, and there was support from extended family in El Salvador to assist raising with raising the children. *Id.*

Mr. Salmeron's "first real memories are from El Salvador." *Id.* at 3. He remembers "working on farms and struggling to have adequate food or shelter." *Id.* His father was always on the move looking for work. *Id.* Money and basic resources—including electricity—"were always in short supply." His childhood memories, which one normally associates with innocence and fun, were spent "working a lot and feeling physically and emotionally tired from the work." *Id.* Sadly, on top of these hardships, he recounted that when his father was home he was often "physically

abusive towards [him], pulling his ears, hitting him with sticks and other objects causing bruises, once to twice weekly." PSR at p. 8, ¶ 100. He has "very little memory of school or activities related to being a child." Mitigation Report at p. 3. Mr. Salmeron thinks he completed some formal schooling but is not sure. *Id.*

Throughout 2015, Manuel Salermon was desperately trying to get his children back to New York. Mitigation Report at p. 4. Mr. Salmeron reports memories that included "witnessing fights and violence in the streets and friends and family were always feeling concerned about their safety." *Id.* at 4. People would "disappear", and he would have "no idea what happened to them." *Id.* The family finally was able to save enough money, with support from his aunt, and Manuel sent his three children alone back to Westbury, Long Island. *Id.* The children left their father not knowing it would be the last time they saw him. *Id.* They flew by themselves to New York and again moved in with Cruz Hernandez. Alone, in a foreign land, they moved into a crowded and tense home. *Id.* There were 14 extended family members in the home and two sets of renters in individual rooms in the house: his Aunt Cruz Hernandez; her partner and their three children – two adult sons and one adult daughter; Mr. Salmeron's paternal uncle; and the family rented out two rooms – one to a family of six – two parents and four children; and two men rented another room. *Id.* Essentially over twenty people shared this house with just two bathrooms. *Id.* The Salmeron children were forced to grow up—fast. Mr. Salmeron's older brother Mario moved out within the year of moving to New York and he has had little to no contact with him in several years. *Id.*

Transitioning back to life in Long Island was very difficult for Mr. Salmeron. He describes "feeling extremely alone, missing his father, struggling to navigate the city, hating the winter cold, and having a hard time adapting to English." *Id.* He struggled academically. *Id.* He shared feeling far behind even with the other Spanish speaking students and feeling ashamed of his lack of prior schooling. *Id.* Looking "stupid" or incompetent is still a trigger for him, likely activating these memories. *Id.*

Mr. Salmeron's isolation only deepened when the limited support provided by his father from afar was forcibly removed from his life: in March of 2016, when Mr. Salmeron was 14, Manuel was arrested in El Salvador and imprisoned. *Id.* Mr. Salmeron has no idea why he was arrested and has not heard from or about him in over 8 years. *Id.* He has no idea if he is dead or alive. *Id.*

"Depressed and scared", Mr. Salmeron turned further inward in Long Island, withdrawing from talking to family at home, and often skipping school and running away. *Id.* He states that he wanted to escape his feelings. *Id.* at 5. The household in Westbury was a stressful and chaotic environment. Mr. Salmeron describes his aunt as supportive, naming her instantly when asked about who in his life has been a positive force. *Id.* However, he has only been able to speak with her six times in the past three years. *Id.* Mr. Salmeron has not had any visits outside his defense team since he was incarcerated. *Id.*

Child Protective Services became involved with Mr. Salmeron in the summer of 2016 though he is uncertain why they were contacted or who contacted them. In August of 2016, when Mr. Salmeron was 14 years old, he was removed from Cruz's house and placed in the first of several group homes that he would move through in the next three years. *Id.* According to Mr.

Salmeron, these homes were profoundly frightening places, "with boys of various ages, all with severe trauma histories and short tempers, living in impersonal bunks with very little privacy." *Id.* Mr. Salmeron remembers "running away from the group homes and desperately wanted to be back at Cruz's home and with some connection to family." *Id.* This is corroborated by a local news article that reported on Mr. Salmeron and his sister running away and going missing. https://patch.com/new-york/hicksville/teenage-siblings-nassau-reported-missing.

During this period, Mr. Salmeron's depression deepened into suicidality and overt self-harm. *Id.* Both Ms. Crawford and the Defense have observed dozens of cutting marks over both of Mr. Salmeron's forearms. When asked about these scars by Ms. Crawford, he was "relatively forthcoming, possibly relieved to get to talk about it with anyone." *Id.* at 6. He "recounts first starting self-cutting, using disposable razor blades, after being returned to the first group home a bit before his fifteenth birthday." *Id.* Tragically, "[n]o one ever addressed his mental health with him at the time, and he has still never received any therapy or treatment for depression, trauma, or suicidality." *Id.* Regarding his mental state prior to veering into criminal conduct, Mr. Salmeron "felt alone and hopeless." *Id.* "There was no point in living," because "[t]he only place [he] felt at home was thousands of miles away." *Id.* Both he and his sister recall "feeling very unsupported, with the sense that they remained invisible to any adults who could have helped." *Id.* It was in this environment and psychological state that Mr. Salmeron first meets other young people on Long Island connected to MS-13 and begins the path that leads to the instant case and crimes of conviction.

**Guidelines sentencing Range and Guidelines Policy Statements.**

The Supreme Court's decision in *Booker/Fanfan* requires sentencing courts to treat the Guidelines as one of several sentencing factors set forth in 18 U.S.C. § 3553(a). As the Supreme Court held, the now revised Sentencing Reform Act ("SRA") requires a sentencing court to consider Guidelines ranges, see 18 U.S.C.A. § 3553(a)(4) (Supp. 2004), but it permits the court to tailor the sentence considering other statutory concerns as well, *see* § 3553(a). *Booker*, 125 S. Ct. at 757.

As such, in each case a court must make an "individualized assessment" of the appropriate sentence "based on the facts presented" and the factors detailed in§ 3553(a). *Gall*, 128 S.Ct. at 597. Additionally, judges "may vary [from the Guidelines ranges] based solely on policy considerations, including, disagreements with the Guidelines." *Kimbrough*, 522 U.S. at 101-02, 128 S. Ct. at 570 (internal quotations marks omitted).

A relevant policy statement the Defense would ask that the Court consider is the 2024 United States Sentencing Commission amended policy statement regarding youthful individuals. Https://www.ussc.gov/policymaking/amendments/2024-youthful-individuals-amendment.

As cited by Probation in their findings as to why a variance may be appropriate, Mr. Salmeron was approximately 19 when he engaged in the underlying offense conduct. In combination with the tragic circumstances of his life, we ask the Court to also consider advances in the understanding of how adolescent brain development impacts culpability. We ask that the

Court consider this amendment by the Sentencing Commission, and its underlying reasoning, in the context of a variance (and not a departure).

In sum, a sentencing court must consider all of the § 3553(a) factors, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing and a judge "is not prohibited from including in that consideration the judge's sense of what is a fair and just sentence under all circumstances." *Jones*, 460 F.3d at 195. Further, as one district judge has noted, "the Guidelines may be tempered by compassion." *United States v. Kloda*, 133 F. Supp. 2d 345, 349 (S.D.N.Y. 2001) (Hellerstein, J.).

## C. The Difficult Conditions in Custody Warrant Consideration

Nothing in the Guidelines considers the pervasive violence and inhumane conditions of confinement that Mr. Salmeron has experienced in the MDC. The waning of the Covid pandemic and epidemic staffing shortages have brought isolation, lockdowns, and restriction of most inmate programs. Visitation has been more restricted until recently, and for Mr. Salmeron, non-existent. These are factors which the Court may fairly consider when fashioning a just sentence in this case as well as providing context to the infractions that have been brought to the Court's attention by the Government.

The Second Circuit has recognized that harsh prison conditions are a factor to be considered in arriving at a just sentence under § 3553(a). *United States v. Carty*, 264 F.3d 191, 196 (2d. Cir. 2001). Judges in this Circuit have acknowledged that the conditions constitute punishment beyond what the law requires and that the trauma experienced by an inmate because of pandemic-related isolation and fear of infection can be the basis for a lower sentence. Several courts have granted downward variances at sentencing based on the harsh conditions at local detention facilities both before and during the pandemic. Jail conditions seem to have only worsened. This Court—with several others—has been forced to publicly address gross mismanagement of medical care of prisoners at the MDC, along with the overall dysfunctional operation of the facility. *See*, https://www.nydailynews.com/2024/05/06/judge-demands-answers-from-brooklyn-federal-jail-officials-over-inmates-medical-woes/

The prison conditions that Mr. Salmeron has been subjected to should also be duly considered in fashioning a sentence and assessing "just punishment." As the Honorable Paul Engelmayer observed, "[a] day spent in prison under extreme lockdown…exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing." *U.S. v. Lizardi*, 11 Cr. 1032-55 (S.D.N.Y. 2020) (PAE), ECF. No. 2523, at 7-8 (collecting cases) (releasing defendant with no underlying health issues, concluding that the combination of COVID, jail conditions, the short period left on his sentence, and other § 3553(a) factors constituted extraordinary and compelling circumstances).

Judge Engelmayer, more recently in United States v. Arias, 22 CR. 495, (S.D.N.Y. June 7, 2023) (ECF # 34 at p. 33), again expressed his concern regarding conditions at the MDC, this time in the context of whether to incarcerate a defendant upon a plea to a narcotics offense, and held that:

". . . where a defendant is not a risk of flight, is not a danger to the community, and there aren't special reasons for them to be remanded, avoiding putting a defendant in conditions as that [referring to the poor conditions at the MDC] qualifies as an exceptional reason under § 3145(c)."

In a thoughtful and detailed opinion, Judge Furman recently also took the MDC to task for its failures and declined to remand a defendant upon a plea. *See* United States v. Chavez, 22 13 Cr. 303 (S.D.N.Y. January 4, 2024) (ECF #31). In that opinion, Judge Furman noted the "near perpetual lockdowns," and "dreadful conditions at the MDC and the lengthy delays in getting medical care." Judge Furman also made note of the fact that "[c]ontraband – from drugs to cell phones – is widespread" – and noted that "[a]t least four inmates have died by suicide in the past three years." *Id.* at p. 2. Judge Furman also pointed out that "[i]t has gotten to the point that it is routine for judges" in both the Southern and Eastern Districts "to give reduced sentences to defendants based on the conditions of confinement in the MDC. *Id.* at pp. 2-3. After a thorough analysis of the conditions at the MDC, Judge Furman concluded that "the only way [as opposed to raising salaries and increasing staff] to mitigate the ongoing tragedy is to improve the ratio of correctional offices to prisoners by reducing – or at least not adding to – the prisoner population." Id. at pp. 2-4.

As Judge Furman concluded, the routine and all too frequent lockdowns, the slowness of the MDC in providing necessary medical and mental health treatment to inmates and the physical conditions at the MDC – mold, contaminated drinking water, vermin and roaches in showers, are factors to be considered at this point. Whether through negligence, inadvertence, malfeasance or simply an inability properly to administer the facility, these conditions at the MDC may fairly be considered. *Chavez* at p. 15. Indeed, Judge Furman's detailed and annotated anthology and analysis of the shortcomings of the MDC is stunning to say the least and is reflected in many decisions by judges in this district.

The conditions at the MDC have only deteriorated further since Judge Furman's decision. Lockdowns continue to be persistent. Moreover, recent events highlight the chaos and violence existing within the MDC to which inmates are subjected and from which the institution appears incapable of protecting the inmates. On just one day in June of 2024: an inmate died of a heart attack; there was a violent stabbing fight on the 7th floor which led to serious injuries; and an inmate in Unit 82 was stabbed to death. The tragic depths to which conditions now have devolved are far beyond anyone's comprehension. The conditions at the MDC have sunk to new levels of inhumanity and the institution appears unable to safeguard its inmates.

In *United States v. Cirino*, 19 Cr. 323 year (S.D.N.Y. 2019) (JSR), the Court varied downward from a 57 to 71-month Guideline Range to a 10-month sentence of incarceration, recognizing that, "[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the Court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons."

Similarly, in *United States v. Daniel Gonzalez*, 18 Cr. 669 (S.D.N.Y.) (JPO), the Honorable J. Paul Oetken, recounted the stark deprivations that inmates have experienced during the pandemic, and observed:

> And I do believe that because it has been harsher than a usual period, that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served. So I think that having served 24 months is equivalent to having served three years. That's what I believe in terms of how punitive it's been and how harsh it's been.

As outlined above, it is not just disease, mismanagement and understaffing that must be considered when assessing the infractions that Mr. Salmeron has been cited for—but mainly the rampant violence. Violating prison rules and having the type of contraband that Mr. Salmeron was found to have is not acceptable conduct. However, there is a difference between acceptable conduct and conduct that is at least understandable. Mr. Salmeron has spent two years in hell—by virtue of his own choices—but nonetheless he has lived in an environment where he is left to his own devices to survive and not be killed. He did not cooperate with the Government in any fashion and in taking the legal steps to be the first on this indictment to take responsibility for his own actions and move on to be sentenced, he has exposed himself to potential threat from within (lest his actions be misunderstood or disagreed with), as well as from any external group or prisoner who decides they want to attack him. He's tiny—and not nicknamed "the Dwarf" by accident. Combine that reality with a jail facility that is morbidly understaffed and clearly unable to manage its operation: what confidence should Mr. Salmeron have that he will be kept safe by the institution itself? Nothing stated here is meant to justify the possession of contraband in a jail at all; the argument being presented is that when confronted with the choice to follow every rule or be killed at any given moment, most would at least consider breaking a rule that impacts whether they live or die. Of note: he's never been accused or using any weapons, fighting, or inflicting violence upon any staff or inmate while at the MDC.

I'd like to also touch on Mr. Salmeron's recent cited disrespect for staff and the slur he is alleged to have used. There is no universe where such language is appropriate or allowable if used in the manner the Government is asserting that it was—or otherwise. Rather than ignore the topic or avoid an uncomfortable dialogue about it, I think it best to address it. In my many meetings with Mr. Salmeron—an uneducated and rough young man—he has used a variation of that word in the, shall we say, colloquial sense. This would be referring to everybody—myself, the Government, other inmates—irrespective of the actual race of the person he was speaking about. If he ever referenced jail politics and was referring to people of color, he called them black—not that horrible word in the report. When referring to things happening within his own group—Salvadoran men almost exclusively—he used a variation of the word cited in the report to describe them. I say this all to say that, in my experience and observations, Mr. Salmeron is not racist—he is young, rough and inarticulate. He speaks in slang that is common for his age and all demographics I have encountered in many years of representing criminal defendants in state and federal courts.

It is in this context we respectfully request that the Court consider the horrors of confinement at the MDC and the complexity of Mr. Salmeron's situation and credit these

experiences in terms of a final sentence.  At the very least, the Defense requests that his sentence not be worse based on the disciplinary infractions cited.  This is an exceptionally bad time to be a prisoner in the custody of the United Stated Federal Bureau of Prisons.

## V. CONCLUSION

For the foregoing reasons, including Probation's findings that a downward variance may be warranted, Mr. Salmeron's age and lack of criminal history, the defense respectfully requests that the Court sentence Mr. Salmeron to a below guidelines sentence not to exceed 108 months.

Dated:  November 10, 2024
New York, New York

_____/s/_____
Yusuf El Ashmawy, Esq.
The Law Offices of Yusuf El Ashmawy, Esq.
305 Broadway, 7th Floor
New York, NY 10007
(718) 207-5787
*Counsel for Tylor Salmeron*

/s/
Margaret Shalley, Esq.
225 Broadway Suite 715,
New York, NY 10007
*Counsel for Tylor Salmeron*

JENNY G. CRAWFORD, LMSW
Mitigation Specialist + Licensed Social Worker License Number: 072690-1

---

October 22, 2024

Honorable LaShann DeArcy Hall
United States District Judge, Southern District of New York
Daniel Patrick Moynihan United States Courthouse
50 Pearl Street
New York, NY 10007-1312

Re: United States v Tylor Salermon Docket No.: 0207 1:20CR0028(s-2)-026 (LDH)

Dear Judge DeArcy Hall,

Tylor Salmeron is a 22-year-old young adult haunted by never having a place to belong. He does not know where he was born, told somewhere in New York, and lived most of his formative years outside of San Salvador, El Salvador, where he witnessed and experienced unimageable violence and depravation for over a decade. This mitigation report is submitted at the request of Margaret Shalley, Esq. and Yusuf El Ashmawy Esq.—defense counsel for Tylor Salermon, who has been incarcerated at Metropolitan Detention Center (MDC) for over two years awaiting sentencing.[1] At the time of the instant offense, Tylor was just 19 years old, untethered to a safe reality and managing the developmental shifts of adolescence. Mr. Salmeron candidly admits that leading up to his arrest he was drinking, smoking marijuana excessively, committing self-harm and distancing himself from the only family members he had around him that could help him stop his poor decision making. He has taken full responsibility for the offense conduct and now seeks this Court's mercy with respect to the sentence that will be imposed by Your Honor.

**Introduction**

Tylor Salermon is very small - he stands only 5' 1" – and is very slight. He was given the nickname "Duende," which means "Dwarf" and carries this nickname with a degree of defiant pride, which nonetheless makes the history of pain or teasing clear. To this day, he doesn't name a single person as his 'friend.' Tylor's life story is that of a child who was profoundly alone, making decisions the best they could with the information and circumstances he had. After over two years of incarceration navigating the pressures and dangers of gang affiliation, Tylor is desperate to move forward in life and take responsibility for his actions.

This report provides a narrative of Tylor's early childhood and adolescent traumatic experiences leading up to his arrest as well as context regarding his familial instability and eventual involvement in the Mara Salvatrucha street gang (known as "MS-13"). Our intention is not to excuse Tylor's actions, but to contextualize them within his life course, as well as the broader

---

[1]

1

Salvadoran immigration and MS-13 presence in Long Island. An examination[2] of Tylor's life story suggests that involvement in MS-13 represented an attempt at survival in an ambience of danger and extremely limited opportunity, rather than any innate or permanent criminal or anti-social tendency. He is now an emerging adult with the flexibility and desire to make changes in his life. He recognizes that there are still a few family members willing to step up and support him – something he never accepted before when he focused solely on the loss and disconnection within his family of origin.

Information contained herein is based upon multiple clinical interviews [3] with Mr. Salermon. As a licensed social worker and mitigation specialist, questions are framed in order to elicit the thinking processes, the lived experience, and the self-awareness as described by the client, to further their understanding of how a client functions. These interviews include observation of the client's demeanor, affect, mood, speech and language, thought processes and behavior. Additionally, I have consulted with defense counsel, reviewed relevant legal documents, supported the client through taking the plea and visited and spoken several times with Tylor's paternal Aunt and sister both living in Westbury, Long Island.

### Early Life and Family Instability

Tylor was born November 30, 2002, but is unaware of any details of where or what time he was born or what he was like as a baby or toddler. He is the third child born to parents Manuel Salermon and Melinda Colon, joining two older siblings – his sister, Lucinda Salermon, who is one year older, and his brother, Mario Salermon, who is three years old. Tylor entered into a fractured family living on the margins with no permanent home. He has no memories of his mother –who abandoned the family soon after Tylor's birth. He is told she has serious mental health issues and presents in meetings with me dissociated from the relationship a mother has with a child. He reports that she has several other children and states that he has "maybe 8 half-sibling" whom he has never met.

Facing the seemingly impossible task of raising three young children alone, Manuel Salermon opted to relocate the family back to El Salvador when Tylor was three years old. According to Cruz Hernandez, Manuel Salermon's aunt who lives in Westbury, Manuel relentlessly tried to make it work New York on behalf of his children, knowing returning to El Salvador was a dangerous option. Nevertheless, his lack of legal status created tremendous barriers for the family to live safely in the United States, and there was broader support from extended family in El Salvador that he needed assistance from to raise the children.

---

[2] This report was compiled based on extensive interviews with Tylor Salermon, his older sister, Lucinda Salermon and Cruz Hernandez, paternal aunt who lives in Westbury, NY.

[3] Clinical and forensic practice relies on clinical interviewing as a key component of formulating opinions and diagnoses (Miller 2013).

 

One of the only Christmas photos of the Salermon family.  This is when Tylor was one and is taken at Cruz Hernandez's home in Westbury, Long Island.

Tylor's first real memories are from life in El Salvador.  He remembers working on farms and struggling to have adequate food or shelter.  His father was always on the move looking for short term work—even travelling to other parts of the country to find it.  When home, there was often physical abuse inflicted upon Tylor—including pinching and hitting. Money and electricity were always in short supply. He remembers working a lot and feeling physically and emotionally tired from the work .  He has very little memory of school or activates related to being a child. School for Tylor was at best intermittent - Tylor thinks he completed some formal schooling, but is not sure.  He still cannot read well, though he attempts to conceal this during our meetings.

Traumatic childhood events are referred to as Adverse Childhood Experiences (ACEs). These experiences create dangerous levels of stress that disrupt healthy brain development and create an increased risk for unhealthy behaviors throughout one's life. The Centers for Disease Control and Prevention and Kaiser Permanente conducted a longitudinal study comprising 17, 377 middle-class adults with an average age of 57 years.[4] The study examined the impact of ACE on physical health and social functioning. They also examined the relationship between ACEs and adult risk-taking behaviors. The ACE Study divided childhood adverse experiences into ten categories. Participants were instructed to check the categories that reflected their childhood experiences. Each category equaled one point and based on the number of categories that were checked the participant received a score ranging from 0 to 10. This test was provided for Mr. Salmeron and he scored 9 out of 10.

The study revealed that high ACE scores are linked to poor outcomes in physical and mental health and social functioning. Individuals with high ACE scores were significantly more likely to engage in behaviors that placed their health at risk as adults. Understanding the full scope of the abuse and neglect Tylor has endured will be a long process.  Tylor would greatly benefit

---

[4] 7https://www.cdc.gov/violenceprevention/childabuseandneglect/acestudy/index.html?CDC_AA_ref Val=https%3A%2F%2Fwww.cdc.gov%2Fviolenceprevention%2Facestudy%2Findex.html

from continued and targeted therapeutic interventions with psychoeducation and trauma-informed counseling and is recommended this as part of his sentencing.

### Struggle to Adjust in El Salvador

In 2015, the truce that had briefly established peace between El Salvador's warring MS-13 and Barrio 18 gangs dissolved into even greater violence. While 2013 was the safest year in recent history in El Salvador, with only 2,492 homicides, rates of violence climbed to 6,657 homicides by 2015.[5] While the government had actively participated in brokering the truce, they began intensively cracking down on gang activity, including summarily executing supposed gang members.[6]

For the entire year of 2015, Manuel Salermon was desperately trying to get his children back to New York. Tylor reports memories that included witnessing fights and violence in the streets and friends and family were always feeling concerned about their safety. People would disappear and he would have no idea what happened to them. The family finally was able to save enough money, with the support from his aunt, and Manuel sent his three children alone back to Westbury, Long Island. They again said goodbye to their father not knowing it would be the last time they saw him. The three children flew by themselves to New York and again moved in with Cruz Hernandez. The three lost young adolescents landed into an over- crowded and tense home. There were 14 extended family members in the home and two set of renters in individual rooms in the house: his Aunt Cruz Hernandez; her partner and their three children – two adult sons and one adult daughter; Tylor's paternal uncle; and the family rented out two rooms – one with for a family of 6 – two parents and four children; and two men rented another room. Essentially over 20 people shared this house with two bathrooms. The Salermon children soon would learn they were each on their own. Tylor's older brother Mario moved out within the year of moving to New York and Tylor and has had little to no contact with him in several years.

By all accounts, transitioning back to life in Long Island was challenging and confusing for Tylor. He describes feeling extremely alone, missing his father, struggling to navigate the city, hating the winter cold, and having a hard time adapting to English. He struggled academically. He shares feeling far behind even with the other Spanish speaking students, and feeling ashamed of his lack of prior schooling. Looking stupid or incompetent is still a trigger for him, likely activating these memories, and have surfaced when discussing his contacts with the criminal legal system and understanding the process from taking the plea to the sentencing date.

Tylor's isolation only deepened when the limited support provided by his father from afar was forcibly removed from his life: in March of 2016, when Tylor was 14, Manuel was arrested in El Salvador and imprisoned. Tylor has no idea why he was arrested and has not heard from or about him in over 8 years. He has no idea if he is alive. While Tylor does not talk about negative

---

[5] Macrotrends global crime data, accessed from https://www.macrotrends.net/global-metrics/countries/SLV/el-salvador/murder-homicide-rate.

[6] Clarke, K. (2021). El Salvador's death squads have new targets but continue their bloody work. *America: The Jesuit Review.* Accessed from https://www.americamagazine.org/politics-society/2021/10/14/el-salvador-death-squads-crime-bukele-impunity-extrajudicial-killing.

feelings very readily, he describes this period as "very bad." Depressed and scared, Tylor turned inward, withdrawing from talking to family at home, and often skipping school. He states that he wanted to escape his feelings. The household in Westbury was stressed and chaotic. Though he is not aware how Tylor describes his aunt as supportive, naming her instantly when asked about who in his life has been a positive force. However, he has only been able to speak with her six times in the past three years. Tylor has not had any visits outside his defense team since he was incarcerated. Tylor is defensive of her in absence, stating, "[s]he's a good person, just had too much going on."

Child Protective Services were alerted sometime in the summer of 2016 though Tylor is uncertain why they were contacted or who contacted them. In August of 2016, when Tylor was 14 years old, he was removed from Cruz's house and placed in the first of several group homes that he would move through in the next three years. According to Tylor, these homes were profoundly frightening and cold places, with boys of various ages, all with severe trauma histories and short tempers, living in impersonal bunks with very little privacy. Tylor remembers running away from the group homes and desperately wanted to be back at Cruz's home and with some connection to family.



Photos saved on Cruz Hernandez's phone. This was one of the times Tylor ran away from the group home back to his aunt's place to celebrate his birthday. Cruz relayed that she keeps these photos on her phone to remember a time Tylor was celebrated.

## Depression and Self-Harm

During this period, Tylor's depression deepened into marked suicidality. One of the first things this writer noted upon meeting him is dozens of cutting marks over both forearms. When asked, he was relatively forthcoming, possibly relieved to get to talk about it with anyone. He

recounts first starting self-cutting, using disposable razor blades, after being returned to the first group home a bit before his fifteenth birthday. No one ever addressed his mental health with him at the time, and he has still never received any therapy or treatment for depression, trauma, or suicidality. He felt alone and hopeless. "There was no point in living," he says. The only place they had felt at home was thousands of miles away. Both recall feeling very unsupported, with the sense that they remained invisible to any adults who could have helped. It was in this environment and psychological state that Tylor first meets other young people in Long Island connected to MS-13.

## Context of MS-13 among Salvadorans in Long Island

MS-13, or the Mara Salvatrucha, started in Los Angeles among Salvadoran refugees from the Salvadoran Civil War in the 1980's. According to some historians of the group, the Mara Salvatrucha was seen by original participants as a social group, an outlet for national and cultural pride, and also a means of self-defense for the Salvadoran community.[7] As the majority of Salvadorans were undocumented, they were especially vulnerable to being targeted for robbery, extortion, and violence by existing street gangs, as they could not rely on the police for protection. MS-13, even in the 80's, became known for graphic—though arguably infrequent—violence against members of rival gangs, preferring to use machetes rather than firearms.[8] Steven Dudley, lead author of a 2017 report on the Mara Salvatrucha, argues that it is also impossible to understand the violence of MS-13 outside of the context of the Salvadoran Civil War. Most Salvadorans carry a profound level of generational trauma: extensive personal losses; exposure to brutal murder; the feeling, rooted in lived experience, that the government could and would kill you at the slightest provocation; and an absolute distrust for the police. There is a sense of protection that comes from belonging to an entity that even the government fears.[9]

As MS-13 members faced deportation from LA back to El Salvador in the 80's and early 90's, the group spread to El Salvador, as well as to other American cities with large Salvadoran populations, including Long Island. Two oral histories both trace the origins of MS-13 on Long Island to 1991, either emerging first in Freeport and spreading to Westbury, or being sparked in Hempstead by members from LA fleeing arrest, and spreading from there east to Brentwood.[10] Both narratives root the appeal of MS-13 in the need for territorial defense and protection of the growing Salvadoran community from perceived racism and targeting by existing Puerto Rican and African American street gangs.

---

[7] Garcia, C. (2018). The birth of the MS13 in New York. InSight Crime. Accessed from https://insightcrime.org/news/analysis/birth-ms13-new-york/.

[8] Barak, M. P., León, K. S., & Maguire, E. R. (2020). Conceptual and empirical obstacles in defining MS-13: Law-enforcement perspectives. *Criminology & Public Policy*, *19*(2), 563-589.

[9] InSight Crime (2017). MS13 in the Americas: How the world's most notorious gang defies logic, resists destruction. [Report]. Accessed from https://insightcrime.org/wp-content/uploads/2018/02/MS13-in-the-Americas-InSight-Crime-English-3.pdf

[10] Supra Garcia (2018).

[11] ibid.

In seeking to understand the role of MS-13 in Tylor's life, it is crucial to recognize the dimension of social belonging that membership conveys. According to Steven Dudley, both in El Salvador and the United States "MS-13 is like a surrogate family. Members join for many reasons but mostly because they are vulnerable, marginalized and lacking any clear way to climb the social and economic ladder. What they find in the gang is a close-knit group that they think of as a source of protection."[12] In the 2017 InSight Crime report, the authors write: "The MS13 is a social organization first, and a criminal organization second. The MS13 is a complex phenomenon. The gang is not about generating revenue as much as it is about creating a collective identity that is constructed and reinforced by shared, often criminal experiences, especially acts of violence and expressions of social control. The MS13 draws on a mythic notion of community, a team concept, and an ideology to sustain a huge, loosely organized social and criminal organization."[14]

In many ways, Tylor's story is extremely typical of youth who get involved in MS-13. The best information available about the composition of MS-13 comes from a survey of 1,196 current and former members, most currently incarcerated, in El Salvador.[13] The authors of that study found that "the vast majority of people with a record of gang membership interviewed for this study come from the most underprivileged sectors of Salvadoran society. Most respondents dropped out of school before turning 16 and did not even complete middle school. Seven out of ten are from households with a monthly income below $250 and more than 80% have not had a regular job, either in the formal or informal sector. In addition, most respondents come from dysfunctional and disintegrated families. Nearly half of gang members and former gang members reported having run away from their family's home before turning 15 years old, primarily due to domestic violence and family problems."

More than anything else, Tylor felt that all other options had been closed off to him. Discrimination and exclusion at school had meant, he felt, that he didn't have many skills with which to get a job; the group home was overtly dangerous, he couldn't return to his aunt's home, and all the adults who had cared about him were far away. Among the greatest benefits that involvement with MS-13 offered was a home. While Tylor has been characterized as an "MS-13 member" by the prosecution, it is important to understand the depth of Tylor's involvement and how he will move forward. Tylor's involvement with MS-13 was for only two years, from 17 to 19, prior to his arrest. He has been held at the MDC for longer than he was ever involved with MS-13. He is not alleged to have been a leader or manager within the organization and as at most—based on his age and lack of status—a low-level associate within the group.

This is not at all intended to minimize the gravity of the acts that Tylor pled to, but to contextualize the depth of entrenchment that MS-13 has had in his life so far, which impacts how

[12] Dudley, S. (2018). How to leave MS-13 alive. [Opinion]. New York Times. Accessed from https://www.nytimes.com/2018/04/26/opinion/ms-13-gang-religion.html [14] Supra InSight Crime (2017).

[13] Cruz, J. M., Rosen, J. D., Amaya, L. E., & Vorobyeva, Y. (2017). The New Face of Street Gangs: The Gang Phenomenon in El Salvador. Report presented to: The Bureau of International Narcotics and Law Enforcement Affairs (INL), U.S. Department of State. Florida International University.

building a life outside of the group may look for him. As a very young man, he still has his entire life ahead. This circumstance speaks to greater probability and hope for change relative to others.

## Conditions of Confinement

Tylor Salermon has been incarcerated at Metropolitan Detention Center (MDC) in Brooklyn for over two years. The unit on which he is being held is almost entirely composed of MS-13 members. He discloses that he has been sleeping only three to four hours a night, for fear of being attacked in his sleep. The focus on day to day survival makes it very difficult for Tylor to even begin to contemplate and imagine what his life might look like outside of the framework of MDC. One thing he knows, however, is that he is actively interested in distancing himself from crime and moving forward in a healthy and productive way.

The circumstances are greatly exacerbating Tylor's mental illness. He describes doing his best to stay "low-profile." In our sessions, he has often presented as extremely withdrawn, and it can be difficult for him to share details, especially of his emotions. According to researchers associated with the National Institute of Justice, this emotional numbing, or affective downregulation, is a common symptom of PTSD, one that is especially common in justice-involved youth.[14] His experience in confinement has also greatly reinforced his feeling of profound aloneness. In our sessions, he has often presented with a high degree of hopelessness, raising major fears that he may be experiencing a resurgence of suicidality. The sense of aloneness appears to be one of the biggest drivers of this hopelessness. Tylor was initially very wary of disclosing any details about his case to this writer, distrusting why I was coming back to visit him repeatedly. He stated that in his life no adult showing interest in him has ever been a positive thing, and has many times felt convinced that I was "a cop," that the only reason anyone was showing him kindness was to try to take advantage of him. In one particularly fatalistic statement, he implied that confinement would be the end of his life, and summed it all up with the feeling of aloneness: "I'm coming in here alone, and going out alone." Given his history of suicide attempts and self-harm, we believe that continued incarceration, especially at MDC, puts Tylor at greatly increased risk of making a further suicide attempt, and that approaches that maximize safety and increase his access to treatment will be very important.

A recent ruling by Judge Jesse Furman highlights that conditions at MDC have become so dangerous, due to grievous understaffing, as to in itself constitute compelling reason to direct a defendant to be released rather than sent there. One of the factors cited was four suicides over the past three years. The facility has also existed in a state of near-constant lockdown for the past several years, often for weeks at a time. Despite the extremely high stakes for his safety, Tylor was the first co-defendant to take a plea, the first to step towards both accountability and the possibility of a different life ahead. He says that he wants to acknowledge what he has done and accept the consequences the Court deems fair. He has turned to God in the hopes of forgiveness. Despite the

---

[14] Kerig, P. K., Bennett, D. C., Chaplo, S. D., Modrowski, C. A., & McGee, A. B. (2016). Numbing of positive, negative, and general emotions: Associations with trauma exposure, posttraumatic stress, and depressive symptoms among justice-involved youth. *Journal of Traumatic Stress*, 29(2), 111-119. [20] United States v. Chavez, 01/04/24. 22-CR-303 (JMF). Amended Opinion and Order. https://storage.courtlistener.com/recap/gov.uscourts.nysd.580571/gov.uscourts.nysd.580571.32.0.pdf.

state of near-constant lockdown, Tylor has gotten involved with church services and classes.[15] Involvement in the church is well-established as one of the few viable pathways out of MS-13,[16] and is one further factor indicating that, given a chance, Tylor may in fact be able to create a life for himself that does not involve further deepening his connection to the gang, or further danger to the public.

There is increasing research suggesting that incarceration itself substantially increases the likelihood of violent recidivism.[28] We suggest that these factors mean that a shorter period of incarceration, in Tylor's case, is actively likely to reduce, rather than increase risk to the public. An outcome that involves a shorter period of incarceration greatly increases the likelihood that Tylor might be able to seize the chance he has now, in this moment of transition as an emerging adult, to be able to successfully distance himself from crime, and with sufficient support, set out on a different path.

Tylor has several factors going for him that make it more likely that he may be able to successfully reintegrate into society. The fact that his tattoos are all family names, is a substantial safety factor, both increasing the likelihood that Tylor could obtain legitimate employment, and also decreasing the likelihood of his being targeted either by other gangs. Research has shown that immersive involvement in either church or employment are some of the only reasons deemed allowable by gang leadership for decreasing involvement, though they often still police former members' authenticity of religious commitment.[17] Tylor has already demonstrated the beginnings of interest in this pathway while at MDC. Over the course of meeting and working with Tylor and his family, it has also become clearer to him that, while it is small, he does have some meaningful support. He and his sister Lucinda maintain a deep bond, speaking on the phone almost every week for the past three years. She made it clear that she will support Tylor in any way that she can.

We have discussed his safety and addressed the pervasive violence he's been exposed to in the MDC.[18] Tylor is hypervigilant in this environment and the ongoing violence at MDC cannot be minimized.[19]

---

[15] See attached certificates of programming.

[16] Supra Cruz et al. (2017), Dudley (2018).

[17] Supra Cruz et al. (2017).

[18] https://www.justice.gov/usao-edny/pr/federal-charges-announced-against-inmates-violent-crimes-committed-metropolitan

[19] A grand jury indicted Luis Rivas today on attempted murder in a federal detention facility, assault in a federal detention facility, and possession of contraband in prison for his role in the April 27, assault of another inmate at the MDC. At the time of the attack, Rivas was detained at the MDC after being convicted of racketeering and assault in-aid-of-racketeering charges related to his membership in the gang La Mara Salvatrucha (MS-13). On the morning of April 27, Rivas and two other MS-13 members brutally attacked another inmate in their housing unit. Prior to the attack, the victim was sitting peacefully, relaxing with his feet up. Rivas then approached the victim, took a makeshift weapon from his waistband, and stabbed the victim with it. Two other MS-13 members then came to Rivas' aid and assisted him in punching and stabbing the victim repeatedly. After the assault, the victim was taken to MDC's medical unit and then to a hospital to treat the approximately 44 stab wounds to his back, chest, abdomen, right arm and legs. https://www.justice.gov/opa/pr/federal-charges-announced-against-inmates-violent-crimes-committed-metropolitan-detention



Drawing of his tree of life tattoo representing those in his family that have passed away.

**Conclusion**

Tylor Salermon is a young person who never really got to be a child. His story has always been life-or-death seriousness, attempting to survive largely alone, in a hostile world. This Court has the opportunity to allow him a renewed chance at a life that is not just violence - a chance for hope, connection, and possibility. Familial support on the outside is ready to help him make that change. Given his history of utilization of the skills and resources available to him, were Tylor ever given a meaningful chance at employment, education, and support in a new environment, we suggest that he would present little danger of reversion to gang activity and little danger to the public. An unreasonably long sentence in prison where affiliation is often the only route to survival, would negatively influence options for rehabilitation, and deepen Tylor's pre-existing trauma and suicidality.

Tylor Salermon recognizes the seriousness of the crimes for which he is charged, however, we ask the Court to consider mitigating factors that weigh in favor of imposing the minimum sentence. Tylor is at a pivotal point of change in his life and is genuinely ready to lead a safe and law-abiding life.

Respectfully Submitted,

_____

Jenny Crawford, LMSW, License Number: 072690-1
Mitigation Specialist



Cruz Hernandez's home where Tylor can return and live in Westbury, NY.  Cruz showing the only family photo album for the Salermon family.  She is holding on to it for Tylor.

11

# *Certificate of Completion*

### This certifies that

# *Tylor Salmeron*

### Completed the following class:

# The National Parenting Program:

# Phase One

5/1/2024

DATE



**MDC BROOKLYN**

G. Matey, Special Population Coordinator

# MDC Brooklyn
# Recreation Department



*This is to Certify that*

*Tylor Salmeron*

*Has Successfully Completed*

*Sentry Origami Class*

*At MDC Brooklyn*

*This certificate is hereby issued this 7th day of June 2024*

*I. White*

*Recreation Specialist*

# *Certificate of Completion*

Metropolitan Detention Center, Brooklyn
Brooklyn, New York

*This certifies that:*

## *Tylor Salmeron*
### *Reg. No. 23401-510*



## *has satisfactorily completed*

## **The Self Worth Psychology Workbook**

*and is hereby awarded this certificate, this 20th day of August 2024.*

Dr. Ibrahim
Staff Psychologist



# U.S. Department of Justice
# Federal Bureau of Prisons
# Certificate of Achievement

We present this certificate to

## TYLOR SALMERON

### K2 Awareness – 10 Sentry Credits

"Always bear in mind that your own resolution to succeed is more important than any one thing."
— Abraham Lincoln

*M. John Pierre*

Mrs. M. John-Pierre – Supervisor of Education
Metropolitan Detention Center



*C. Emile*

Mrs. C. Emile - Teacher
June 28, 2024

# MDC Brooklyn
# Recreation Department

*This is to Certify that*

*Tylor Salmeron*

*Has Successfully Completed*

### Sentry Basic Fitness Class

*At MDC Brooklyn*

*This certificate is hereby issued this 4th day of March, 2024*

*I. White*

*Recreation Specialist*



*Amendment effective November 1, 2024*



# 2024 AMENDMENTS IN BRIEF

In April 2024, the U.S. Sentencing Commission approved amendments to the federal sentencing guidelines. For a more detailed discussion of the policy determinations made by the Commission, please refer to the *Reason for Amendment* in the "Reader-Friendly" and Official Text (link in QR code).



## Youthful Individuals

The amendment makes several revisions to **§5H1.1 (Age (Policy Statement))**, which addresses the relevance of age in sentencing. The amended language provides more broadly that **age "may be relevant in determining whether a departure is warranted."**

The amendment adds language specifically providing that a downward departure may be warranted in **cases in which the defendant was youthful at the time of the instant offense or any prior offenses.**

## THE ISSUE
### Advancements in Knowledge

The Commission received testimony and comment from experts in the science and data community conveying advancements in the understanding of youthful development and sentencing, including recognition of the age–crime curve and that cognitive changes lasting into the mid–20s affect individual behavior and culpability.

The Commission has a statutory responsibility under 28 U.S.C. § 991(b)(1)(C) to establish and amend sentencing policies to reflect such "advancement in knowledge of human behavior as it relates to the criminal justice process."

*www.ussc.gov*
*pubaffairs@ussc.gov*
*202-502-4500*

## CONTENTS

The Amendment           1
The Issue               1
Facts & Figures         2
Expert Testimony & Comment  2
Related Statutes        2

*Scan or click QR code for full Reason for Amendment.*





## FACTS & FIGURES

### Age at Instant and Prior Offenses

In fiscal year 2022, approximately 14% of all federally sentenced individuals were age 25 or younger at sentencing. Approximately 5% of all individuals sentenced in fiscal year 2022 were previously convicted and received criminal history points for an offense committed before the age of 18.



**FISCAL YEAR 2022**

| Under 21 | 21 to 25 | 26 to 30 | 31 to 35 | 36 to 40 | 41 to 50 | 51 to 60 | Over 60 |
|----------|----------|----------|----------|----------|----------|----------|---------|
| 1,407 | 7,460 | 10,480 | 11,515 | 10,593 | 14,329 | 5,997 | 2,332 |

## EXPERT TESTIMONY & PUBLIC COMMENT

The amendment reflects expert testimony indicating that certain risk factors may contribute to youthful involvement in criminal justice systems, while protective factors, including appropriate interventions, may promote desistance from crime.

Testimony was provided by neuroscientists and psychologists as well as the executive branch, Federal Public Defenders, advisory groups, criminal justice experts, victims, and formerly incarcerated individuals.

The Commission also received extensive public comment submissions citing recent brain development research studies.



## RELATED STATUTES

### 28 U.S.C. § 991(b)

**The purposes of the United States Sentencing Commission are to—**
(1) establish sentencing policies and practices for the Federal criminal justice system that—
(A) assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code;
(B) provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices; and
(C) **reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process;** and
(2) develop means of measuring the degree to which the sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code.

### 28 U.S.C. § 994(d)

**The Commission in establishing categories of defendants for use in the guidelines and policy statements governing the imposition of sentences** of probation, a fine, or imprisonment, governing the imposition of other authorized sanctions, governing the size of a fine or the length of a term of probation, imprisonment, or supervised release, and governing the conditions of probation, supervised release, or imprisonment, **shall consider whether the following matters,** among others, with respect to a defendant, **have any relevance to the nature, extent, place of service, or other incidents of an appropriate sentence,** and shall take them into account only to the extent that they do have relevance—
**(1) age;**
(2) education;
(3) vocational skills;
(4) mental and emotional condition to the extent that such condition mitigates the defendant's culpability or to the extent that such condition is otherwise plainly relevant;
(5) physical condition, including drug dependence;
(6) previous employment record;
(7) family ties and responsibilities;
(8) community ties;
(9) role in the offense;
(10) criminal history; and
(11) degree of dependence upon criminal activity for a livelihood.

*This document was produced and published at U.S. taxpayer expense.*